IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 0:22-cv-61992

AVINI HEALTH CORPORATION,

    Plaintiff,

v.

BIOGENUS LLC,

    Defendant.

## COMPLAINT

Plaintiff Avini Health Corporation ("Plaintiff") sues defendant BioGenus LLC ("Defendant"), and alleges as follows:

## THE PARTIES

1.    Plaintiff is a corporation organized and existing under the laws of the State of Nevada with its principal place of business located in Broward County, Florida.

2.    Defendant is a limited liability company organized and existing under the laws of the State of Utah with its principal place of business located at 1021 S 1680 W Orem, UT 84058. Defendant's members are each individuals who are citizens and residents of the State of Utah. None of Defendant's members are citizens of Nevada or Florida.

## JURISDICTION AND VENUE

3.    This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000.00, exclusive of interest and costs, and is between citizens of different States.

4.    Venue is appropriate in this judicial district under 28 U.S.C. §1391(b)(1) because

because the events that gave rise to this complaint occurred in this district and because the Agreement (defined herein) contains a venue clause specifying venue in this district:

> 22 **Governing Law & Jurisdiction**: This Agreement shall be governed by the laws of the State of Florida. In the event an action is brought between the parties hereto for the interpretation or enforcement of this Agreement, such action if brought by Client shall be brought in the State or Federal Courts of Florida, in the County of Broward.

5. This Court has jurisdiction over Defendant pursuant to Fla. Stat. § 48.193(1)(a)(7) because it breached a contract in this state by failing to perform acts required by the contract to be performed in this state. This Court also has jurisdiction over Defendant pursuant to Fla. Stat. § 48.193(2) because it is engaged in substantial and not isolated activity within this state.

## BACKGROUND

6. Plaintiff operates on an affiliate marketing model and generally sells branded products for detoxification, immune system support, and over-the-counter pain relievers.

7. Defendant is in the business of manufacturing, sourcing, contracting, packaging, and providing other miscellaneous services related to the production of products for its customers/clients.

8. On or about March 1, 2022, Plaintiff (as client) and Defendant (as manufacturer) entered into a Production and Supply Agreement (the "Agreement") whereby Defendant agreed to produce and/or manufacture certain products on the terms and conditions specified therein. A true and correct copy of the License Agreement is attached hereto as Exhibit "A."

9. The specific product initially contemplated by the Agreement was spherical silver nanoparticles in deionized water.

10. Relevant hereto, the Agreement likewise provides Plaintiff with a right of first refusal for any and all new products developed by Defendant:

> 7. **Future Products and Product Development.** In addition, Manufacturer shall grant Avini Health Corporation the right of first refusal for any and all new products (the "New Products") for consideration in the Territory through the Authorized Channel of Trade. Avini Health Corporation will be given a maximum period of thirty (30) days to review the New Products before other potential customers are solicited. If New Products are accepted for distribution by the Client, an Amended Production and Supply Agreement will be created.

11. This 'right of first refusal' was material to Plaintiff's entry into the Agreement and was specifically discussed with Defendant's principal (Gary Samuelson) prior to execution thereof.

12. According to Mr. Samuelson, he was instrumental in the development of the "REDOX Cell Signaling Supplement" for ASEA, a privately owned international direct selling and multi-level marketing company founded in 2007 and headquartered in Utah.

13. ASEA's REDOX product is salt water that contains electrically charged "redox signaling molecules that is marketed as helping to protect, rejuvenate, and restore cells at the genetic level.

14. Prior to executing the Agreement, Mr. Samuelson represented that he was the key person in developing ASEA's REDOX product.

15. Upon information and belief, ASEA does approximately $180 million in sales (equating to approximately $60 million in profit) of the REDOX product on an annual basis.

16. Around the time the Agreement was executed, Mr. Samuelson represented that he had been working on a new version of the REDOX product that he helped to formulate. The product was supposed to be a newer version that can work in a 2 oz concentrated spray (ASEA's product is sole in a 32 oz bottle) that was superior to the ASEA product.

17. Mr. Samuelson specifically stated that, once the product was developed, it would be offered to Plaintiff under the terms of the Agreement.

18. On July 9, 2022, Plaintiff held a regional meeting of its distributors/affiliates in

West Jordan, Utah at a Hilton hotel.

19. Following the July 9, 2022 meeting, representatives of Plaintiff met with Mr. Samuelson in a hotel room at which time Mr. Samuelson stated that he did not have the newer REDOX product ready for distribution. Mr. Samuelson had repeated this statement many times from execution of the Agreement through July 9, 2022, always representing that the product was still in development and not ready to be brought to market.

20. On July 8, 2022 (the day prior to the aforementioned meeting), Mr. Samuelson and his wife (Iris) attended a dinner for Plaintiff's distributors/affiliates.

21. At the July 8, 2022 dinner, Mr. Samuelson and his wife were seen coming and going to their car selling and giving out bottles of Defendant's new REDOX product (the 2 oz concentrated spray that Mr. Samuelson continuously represented was not ready). Mr. Samuelson and his wife made multiple representations at the dinner that the product would soon be offered by Plaintiff for distribution.

22. After the July 9, 2022 meeting, Mr. Samuelson and his wife hosted a dinner at their home (in Utah) where they told Plaintiff's distributors that they now had the improved REDOX product ready for sale and guests could buy a bottle for $25 each and that would be much cheaper than when Plaintiff will be selling it.

23. Through the present date, Defendant has refused to sell this newer/improved REDOX product to Plaintiff notwithstanding its contractual obligation and multitude of specific promises to do so.

24. In addition to refusing to sell the new/improved REDOX product to Plaintiff, Defendant has also breached the Agreement by supplying poor quality nano silver product.

25. As part of the party's dealings, Defendant would supply the silver product in 5-

gallon tubs with each having its own batch number. Defendant provided the written specifications in advance of supplying the silver product, all of which indicated that the product was supposed to be yellow in color and have 40ppm of silver per bottle.

26. Plaintiff's first order of nano silver was yellow in color as Mr. Samuelson had indicated. According to Mr. Samuelson, the product must be yellow to be correctly made and that a clear product meant that the silver had "fallen out" of its correct 7 nano sizing.

27. Plaintiff accepted the first batch of nano product from Defendant together with a Certificate of Accreditation that Defendant sent together therewith.

28. The second shipment of 19 tubs, however, were not yellow in color. Almost immediately after receipt, Plaintiff noticed that the product began to turn clear, inculcating a major instability in the product.

29. Plaintiff soon discovered (after testing the product) that there was less than 1ppm of silver per bottle which was far below the 40ppm per bottle indicated on Defendant's Certificate of Accreditation.

30. As a result of the product not meeting specifications, Plaintiff was required to pull back 496 packaged bottles in addition to approximately 15 of the mostly unopened tubs.

31. This amounted to approximately $21,000.00 of out-of-pocket costs to Plaintiff and approximately $217,000.00 in lost sales during the 2022 calendar year.

32. On August 4, 2022, Plaintiff sent a notice of default to Defendant as a result of both the refusal to offer the new/improved REDOX product and the poor quality of the supplied silver product.

33. To date, Plaintiff has been unable to resolve the matter with Defendant who has continued to refuse to supply the new/improved REDOX product and has not taken

responsibility for the poor quality of the supplied silver product.

34. All conditions precedent to the filing of this action have been performed, occurred, or been waived.

## CAUSES OF ACTION

### COUNT ONE – BREACH OF CONTRACT

35. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 34 as if fully alleged herein.

36. The Agreement is a binding, enforceable contract existing between Plaintiff and Defendant.

37. Plaintiff fully performed all of its obligations under the Agreement.

38. The Agreement requires Defendant to manufacture/supply certain silver product meeting agreed-upon specifications.

39. The Agreement further requires Defendant to offer its new/improved REDOX product to Plaintiff for purchase.

40. Defendant breached the Agreement by supplying approximately $21,000.00 of nano silver product that failed to meet Defendant's own specifications.

41. Defendant further breached the Agreement by failing to offer its new/improved REDOX product to Plaintiff for purchase.

42. As a direct and proximate result of Defendant's breaches of the Agreement, Plaintiff has suffered substantial damages, the full amount of which will be established at trial of this matter. Plaintiff's supply of non-conforming nano silver product has caused Plaintiff to incur $21,000.00 in direct damages and $217,000.00 in lost sales (amounting to > $184,000.00 in lost profits). Given ASEA's sales/profits associated with a product that Mr. Samuelson

represents as inferior, Plaintiff believes that Defendant's refusal to sell the improved REDOX product to Plaintiff has resulted in, at minimum, $5 million in lost profits to Plaintiff.

43. Defendant's breaches of the Agreement are ongoing and have already caused and will continue to cause irreparable harm to Plaintiff if not preliminarily and permanently enjoined.

44. Plaintiff has no adequate remedy at law.

**WHEREFORE**, Plaintiff demands judgment against Defendant for compensatory damages, consequential damages, reasonable attorneys' fees, preliminary and permanent injunctive relief, prejudgment interest, and such other relief as the Court deems just and proper.

Dated: October 25, 2022.

DESOUZA LAW, P.A.
3111 N. University Drive
Suite 301
Coral Springs, FL 33065
Telephone: (954) 603-1340
DDesouza@desouzalaw.com

By: /s/ Daniel DeSouza, Esq.
    Daniel DeSouza, Esq.
    Florida Bar No.: 19291

**EXHIBIT "A"**

**PRODUCTION AND SUPPLY AGREEMENT**

This Production and Supply Agreement is made and entered into on this 1st day of March, 2022 by and between Avini Health Corporation with its registered office located at 1537 NW 65th Avenue, Plantation FL 33313 (hereinafter referred to as "Client"), Bio Genus LLC, with his registered office at 819 W 700 N St, American Fork, UT 84003 (Hereafter referred to as "Manufacturer") as follows:

**RECITALS:**

    **WHEREAS**, Manufacturer is in the business of manufacturing, sourcing, contracting, packaging, and providing other miscellaneous services related to various products and

    **WHEREAS** Client sells branded products under the brand name of Avini Health and desires to engage the services of Manufacturer to manufacture and/or produce the product during the term of this Agreement upon the terms and conditions set forth herein; and

    **WHEREAS**, Manufacturer has agreed to produce and/or manufacture products on the terms and conditions set forth herein.

    **NOW THEREFORE**, for good and valuable consideration, the sufficiency of which is acknowledged by the parties hereto and evidenced by their signatures below,

    **IT IS HEREBY AGREED AS FOLLOWS:**

1. **Term of Agreement**: This Agreement shall be effective as of March 1, 2022 (the Effective Date). The term of the Agreement shall continue for a period of two years thereafter. The Agreement shall automatically renew for additional terms of two (2) years unless either party gives notice, at least sixty days prior to the end of the term, of its intention not to renew. During the initial term and any renewal term, either party may terminate this Agreement upon six calendar months prior notice.

2. **Production Commitment**: During the term of this Agreement, Client agrees to submit Purchase Orders to Manufacturer for production of spherical silver nanoparticles in deionized water (the "Product"), which shall be accepted by Manufacturer unless Manufacturer cannot reasonably meet the terms of the Purchase Order, in which case Manufacturer shall contact Client within five (5) business days after receipt so that an appropriate revised Purchase Order may be timely issued. Failure to so inform Client shall constitute Manufacturer's acceptance of the Purchase Order.

3. **Grant of Exclusive License / Rights to Purchase:** Subject to the terms and conditions of this Agreement, Manufacturer hereby grants Avini Health Corporation and Avini Health Corporation accepts, an exclusive right to purchase the Product in connection with advertising, promotion, manufacturing, packaging, shipment, distribution, and sale of the Product worldwide (the "Territory") in MLM and Affiliate programs (the "Authorized Channel of Trade"). The parties hereby agree that the grant of this exclusive license shall mean that, no other party in the Territory shall have the right, directly or indirectly, through the Authorized Channel of Trade, to manufacture, advertise, promote, package, ship, distribute or sell the Product, or any reasonable variation thereof, unless through the express written consent of Avini Health Corporation or through release of new products under Section 7 of this Agreement. During the term of this Agreement,

Client shall not order any products containing silver nanoparticles or silver colloids from any other source except the Manufacturer

4. **Credit Limit**: Manufacturer will be paid agreed upon price per bottle as per Schedule A below

5. **Production Time**: Manufacturer agrees to fill each Purchase Order submitted by Client within the time agreed upon by the parties in the Purchase Order. However, and notwithstanding anything to the contrary herein, the parties agree that Manufacturer shall complete production within six (6) calendar weeks from receipt of the Purchase Order unless otherwise agreed in writing.

6. **Formula Ownership and Changes**: The parties agree that all formulas are, and shall remain exclusively, the Manufacturer, and that the manufacturing of the Product by Manufacturer shall not transfer any right, title, or interest to any of the formulas to the client. The production of the Product will be made exclusively for the Client for sales in the Territory through the Authorized Channels of Trade.

7. **Future Products and Product Development.** In addition, Manufacturer shall grant Avini Health Corporation the right of first refusal for any and all new products (the "New Products") for consideration in the Territory through the Authorized Channel of Trade. Avini Health Corporation will be given a maximum period of thirty (30) days to review the New Products before other potential customers are solicited. If New Products are accepted for distribution by the Client, an Amended Production and Supply Agreement will be created.

8. **Additional compensation**. Effective April 2022, Avini Health will pay Dr. Samuelson a $3,000 monthly stipend for his work on the Science Advisory committee and interactions with the affiliate/distributor force. Avini Health will pay expenses for attending Regional Meetings and National Meetings as long as they have been approved by corporate.

9. **Unplanned Component Price Increases**: In the event that the cost of any raw materials purchased by Manufacturer to fill Client Purchase Orders increases by more than five percent (5%), Manufacturer may pass such cost increase on to Client, provided that Manufacturer shall submit reasonable documentation to Client substantiating the amount of the price increase. In the event the overall Product price increases more than 5 percent during the term of this Agreement, Client shall have the right to cancel the Agreement upon thirty days written notice to Manufacturer.

10. **Right of Inspection**: Client shall have the right to inspect the Manufacturer facility from time to time during Manufacturer's normal business hours during production of Client Product only upon agreement by Manufacturer and at a convenient time as established by Manufacturer, provided however, that Manufacturer may not unreasonably withhold its consent, and that there shall be a rebuttable presumption that twenty-four (24) hours' notice for a visit during normal business hours of Manufacturer is reasonable. In addition, if Manufacturer shall have a right of inspection for any of its vendors that supply raw materials utilized in production, then Client may upon approval of Manufacturer send a designated representative of the company with a representative of Manufacturer to inspect such supplier's facilities.

11. **Shipping**. Manufacturer shall be responsible for loading the Product onto transportation or freight carriers. The Product shall be shipped F.O.B. from Manufacturer's docks. All risk of loss shall remain with Manufacturer until the Product are loaded onto the carrier by Manufacturer. Unless shipped under quarantine, title to the Product and all risk of loss or damage transfers to client at the time Manufacturer

releases the Product to the transportation or freight carrier for shipment to client's fulfillment center. Manufacturer shall be responsible for any additional freight charges incurred due to any failure by Manufacturer to comply with client's reasonable shipment instructions and/or specifications. Manufacturer shall provide to client (i) advanced shipment notices (ASN's), in such form as client reasonably requests to reflect any shipment of Product scheduled for inbound delivery to current and future fulfillment locations; (ii) Production reports; and (iii) shipment reports/notices on Product that are in transit.

12. **Quality Control, Testing, Specifications**. Manufacturer shall manufacture the Product strictly in accordance with the formulas, specifications outlined in schedule B and in compliance with all applicable laws, state and federal standards, and regulations including Food, Drug, and Cosmetic Act (FDCA), Food Safety Modernization Act (FSMA), Food Additives Amendment of 1958, and Chapter 21 of the Code of Federal Regulations (cGMPs). In this regard, if Manufacturer has specified that a certain raw material shall meet certain standards of quality such as a designated percentage of active ingredients or other such quality, Manufacturer agrees that it will not substitute a raw material that does not meet such specified criteria or standard without the prior notification to client. Manufacturer will manufacture the Product using the quality ingredients selected and approved by Manufacturer in accordance with the specifications for such Product (subject to mutually acceptable tolerance levels). Manufacturer shall, at all times, maintain a log of each ingredient in the Products Manufacturer and shall not release Product for shipment unless it complies with the specifications and all applicable laws, rules, and regulations. All Products must be within the specifications required for identity, strength/potency, composition, purity, and stability as required by law.

    Client reserves the right to request shipment of specific Product lots under quarantine to be held as such pending all requirements are met for final release by the Manufacturer. Manufacturer shall determine the best by date or expiration date of the Product and ensure that the date is properly marked on the Product.

13. **Regulatory Standards**. Manufacturer's manufacturing facilities shall be kept and maintained in conformity with all local, state, and federal laws and regulations including but not limited to all applicable requirements imposed by the current Good Manufacturing Practices issued by the Food and Drug Administration (FDA), the Food Drug and Cosmetic Act (FDCA), the Food Safety Modernization Act (FSMA), , Food Additives Amendment of 1958, Chapter 21 of the Code of Federal Regulations (cGMPs), and human ethical considerations throughout the Manufacturer's supply chain. All Products shall be manufactured consistent with all applicable requirements at their facility located in Orem, Utah where the products are being produced.

14. **Batch Production Records**. Batch Production Records ("BPR") for finished Product and/or Products to be packaged must include the batch or lot number for Products and raw materials and be maintained in accordance with Manufacturer's record retention standard operating procedures. Manufacturer shall maintain detailed records on raw materials, packaging materials used, batch records and finished Product Production by lot number date. Manufacturer shall also maintain shipping records for finished Products, so that Products can be accurately traced in the event of a recall. In addition, if client elects to provide Manufacturer with unique lot numbers, Manufacturer shall record those lot numbers in accordance with its record retention standard operating procedure.

15. **Rejected Product**.  While Client shall have the right to perform inspections, client may reject any or all said goods delivered by Manufacturer which are defective or do not meet specifications. All rejected

Products that do not comply with the specifications for that Product will be disposed of by the Manufacturer or client in a manner consistent with the law and as approved by both Parties. Approval for disposal shall be provided within two (2) business days of a request therefore and shall not be unreasonably withheld. Manufacturer shall be responsible for the cost of the disposal of rejected product.

16. **Breach and Opportunity to Cure**: In the event either party hereto is alleged to have breached any of the terms and conditions of this Agreement, the non-breaching party shall submit notice of such breach in writing to the breaching party setting forth the alleged breach. The party to have allegedly breached the agreement shall have thirty days from the date of such notice in which to cure the alleged breach. If the alleged breach is cured within the thirty-day cure period, the Agreement shall remain in effect as though no breach had occurred.

17. **Ownership of Trademarks, Service Marks, or other Intellectual Property**: The trademarks, service marks, patents and other intellectual property of Client shall remain the sole property of Client and nothing herein shall transfer any right, title, or interest of the same to Manufacturer. Likewise, the trademarks, service marks, patents, and other intellectual property of Manufacturer shall remain the sole property of Manufacturer and nothing herein shall transfer any right, title, or interest of the same to Client.

18. **Confidentiality and Nondisclosure**: This Agreement is confidential and shall not be disclosed by either party to any third party who is not a party to this Agreement without the prior written consent of the other party hereto. In addition, Manufacturer shall hold confidential and shall not use for its own or a third party's benefit, or disclose to any other person any confidential information in its possession related to the business of all products sales, including without limitation formulas, manufacturing processes, ingredient sources, registration information, and other information as to which Client derives a financial benefit from its not being generally known or readily ascertainable, without the express written permission of Client. Client shall grant permission to disclose so long as Manufacturer has demonstrated a reasonable need to disclose and has put in place, through agreement, protective order, or applicable professional standards regarding nondisclosure, sufficient protection for the information of Client. Manufacturer shall not manufacture for any third party any product that it also manufactures for Client using Client's formulas or materially the same formulas, under any brand name, without Client's express written permission notwithstanding products not accepted under Section 7 of this agreement.

19. **Indemnification; Insurance**. Manufacturer Supplies agrees to indemnify, defend, and hold harmless Avini Health Corporation from and against any claim, demand, action, proceeding or cause of action made or brought against Avini Health Corporation by any third party, including, without limitation, any judgement rendered against Avini Health Corporation in any legal action and reasonable attorney's fees and expenses incurred by Avini Health Corporation in defending any such claim brought against it except as otherwise provided below ("Damages"), arising out of or resulting from (i) a breach of this agreement by Manufacturer Supplies; (ii) product liability attributable to the products or (iii) the violation or infringement of any trademark, trade dress or other intellectual property right relating to the Product or other specifications or materials selected by Manufacturer Supplies, provided that none of such occurrences are caused by the negligence or willful misconduct of Avini Health Corporation.

Avini Health Corporation agrees to indemnify, defend and hold harmless Manufacturer Supplies from and against any claim, demand, action or cause of action which is made against Manufacturer Supplies by any third party, including, without limitation, any judgement rendered against Manufacturer Supplies in any such action and reasonable attorneys' fees and expenses incurred by Manufacturer Supplies in defending

any such claim brought against it to the extent arising out of or resulting from (i) a breach of this agreement with Avini Health Corporation, (ii) the improper promotion of Products by Avini Health Corporation or its respective employees or agents unless such claim results from the incorrect product profile information supplied by Manufacturer Supplies: or (iii) the violation or infringement of any trademark or trade dress rights relating to the Products (other than those owned by Manufacturer Supplies and licensed to Avini Health Corporation hereunder) or other specifications or materials selected by Avini Health Corporation, provided that none of such occurrences are caused by the negligence or willful misconduct of Manufacturer Supplies.

Upon the occurrence of an event which would give rise to a right of indemnification under this Agreement, the party claiming the right to indemnification (the "Indemnitee") shall give prompt written notice to the other party providing reasonable details of the nature of the event and basis of the indemnity claim. The party obligated to provide the indemnification (the "Indemnitor") shall then have the right, at its own expense and with counsel of its choice, to defend, contest or otherwise protect against any such suit, action, investigation, claim or proceeding ("Action"). The Indemnitee shall also have the right, but not the obligation, to participate at its own expense in the defense thereof with counsel of its choice reasonably acceptable to the Indemnitee. The Indemnitee agrees to cooperate to the extent reasonably necessary to assist the Indemnitor in defending, contesting or otherwise protesting against any such Action provided that the reasonable cost in doing so shall be paid by the Indemnitor. If the Indemnitor fails within thirty (30) days after receipt of such notice to (i) notify the Indemnitee of its intent to defend, or (ii) defend, contest, or otherwise protect against such Action, or fails to diligently continue to provide such defense after undertaking to do so, the Indemnitee shall have the right upon ten (10) days' prior written notice to the Indemnitor, to defend, settle and satisfy any such Action and recover the costs of the same from the Indemnitor.

The provisions of this Section 19 shall survive the expiration of the Term or any other termination of this Agreement.

Parties shall maintain in full force and effect throughout the Term product liability insurance with limits of not less than one million dollars ($1,000,000) per occurrence, and a $2 million rider for three million dollars ($3,000,000) in the aggregate. Such insurance shall name Nutra Pharma Corporation, and its affiliates as an additional insured, shall have broad form vendor's coverage, and shall be placed with an insurance company which has a most recent rating given by Best's Key Rating Guide of at least an "A" (Excellent) or VII or above, or in such other company as Nutra Pharma Corporation may approve. Manufacturer Supplies agrees to promptly deliver certificates of said insurance to Nutra Pharma Corporation. The insurance required by this Agreement shall be primary with respect to any other insurance available to each party and shall contain a waiver of subrogation by such party's insurance carrier against the other party and its insurance carrier with respect to all obligations assumed by each party pursuant to this Agreement.
Each party will provide a copy of any contract of insurance required under this Agreement, upon request from the other party.

20. **Recall**. If the Product becomes the subject of a recall by any governmental agency or in the event a governmental agency requests or suggests that the Product be withdrawn from any level of the market, or the consumer, or in the event Avini Health Corporation or Manufacturer Supplies shall deem that such a recall is necessary, Manufacturer Supplies shall indemnify and reimburse Avini Health Corporation for:

   a. All costs and expenses of notifying the trade and/or consumers of said withdrawal to the level of acceptance to the regulatory agency.
   b. All freight charges actually incurred by Avini Health Corporation, or paid by Avini Health Corporation to its customer, for retrieval of the Products.
   c. All service charges or other monies actually paid by Avini Health Corporation to its customers in line with normal practices in connection with the retrieval of the Products; and,
   d. All costs and reasonable counsel fees incurred by Avini Health Corporation in connection with such recall or market withdrawal.

As soon as possible after notification of the recall, Manufacturer Supplies shall replace the recalled Products with salable Products free of charge to Avini Health Corporation. In lieu of replacement, Manufacturer Supplies will, if requested by Avini Health Corporation, refund the purchase price of such Products or credit Client's account, therefore.

Avini Health Corporation shall indemnify Manufacturer Supplies if a recall or market withdrawal of the Product specifically results from marketing efforts caused by Avini Health Corporation, or its distributors. In the event such a recall or market withdrawal would occur, Avini Health Corporation shall solely bear all costs related to the event.

In the event of a recall or seizure, neither party shall make any statement to the press or public concerning the matter without first notifying the other of the statement to be made.

**21** **Notices**: Any notices required to be given hereunder shall be deemed to have been given on the date such notice is received, and may be sent by United States Mail, Certified with Return Receipt Requested, by Personal Delivery, by Overnight Courier with delivery confirmation, or by fax transmission with delivery confirmation, to the following:

If to MANUFACTURER:
Dr. Gary Samuelson
819 W 700 N St, American Fork, UT 84003

If to CLIENT:

Avini Health Corporation
NW 65th Avenue Plantation, FL 33313
C/O Neil Roth, CEO
(702) 683-9448

**22** **Governing Law & Jurisdiction**: This Agreement shall be governed by the laws of the State of Florida. In the event an action is brought between the parties hereto for the interpretation or enforcement of this Agreement, such action if brought by Client shall be brought in the State or Federal Courts of Florida, in the County of Broward.

**23** **Attorney Fees**: In the event suit or action is brought by either party under this Agreement to enforce any of its terms, or in any appeal therefrom, it is agreed that the prevailing party shall be entitled to an award of its reasonable attorney fees and costs of suit incurred.

**24** **Computation of Time**: In computing any period of time pursuant to this Agreement, the day of the act, event, or default from which the designated period of time begins to run shall be included, unless such day is a Saturday, Sunday, or legal holiday. In such event the period shall being to run on the next day which is not a Saturday, Sunday, or legal holiday.

**25** **Titles & Captions**: All section titles or captions contained in this Agreement are for convenience only and shall not be deemed to be a part of the context nor affect the interpretation of this Agreement.

**26** **Agreement Binding**: This Agreement shall be binding upon the parties hereto, as well as their heirs, administrators, executors, successors, and assigns. This Agreement may not be assigned to any third party without the prior written consent of the other party hereto, which consent shall not unreasonably be withheld.

**27** **Authorization**: Each party hereto warrants that it is in the good standing in the jurisdiction of its origin, and that all necessary formalities required by its organizational and operational documents have been complied with to enter into this Agreement. Each party also warrants to the other that the party executing this Agreement is duly authorized to do so.

**28** **Further Actions and Documents**: Each party agrees that it shall act in good faith and execute such documents and take such actions as may be necessary from time to time to carry out the intent of this Agreement.

**29** **Parties in Interest**: Nothing herein shall be deemed or construed to be for the benefit of any third party.

**30** **Force Majure**: Neither party hereto shall be obligated to perform its obligations herein if such obligations are interrupted by acts of God, war, civil unrest, strikes, labor stoppage, natural disaster or the like that would render the performance of such party impossible.

**31** **Entire Agreement**: This document represents the entire agreement between the parties hereto and supersedes and replaces all other agreements and negotiations regarding the subject matter herein, whether written or oral. This Agreement may only be modified in writing executed by both parties hereto.

**32** **Savings Clause**: If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held by any court of competent jurisdiction to be invalid, only so much of the terms as are necessary shall be removed or modified to render the offending term or terms enforceable. All other terms and conditions of the Agreement shall remain unaffected. In witness whereof, the parties have executed this Agreement effective the day and year first written above.

**Executed by and for:**
**BioGenus LLC**
**By:** _____
**Dr. Gary Samuelson, Its President**

**Avini Health Corporation**
**By:** _____
**Neil Roth, Its CEO**

## SCHEDULE A – PRODUCT PRICING AND ORDER QUANTITIES

Exhibit A Pricing includes that the Manufacturer supplies Nano Silver in 5 Gallon tubs.

Product will be sold in 5 gallon tubs and shipped to Nutra Pharma Corporation at a cost of $1120.00 per tub.