**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-CV-61992-RAR**

**AVINI HEALTH CORPORATION**,

      Plaintiff,

v.

**BIOGENUS LLC**,

      Defendant.

_____/

**ORDER GRANTING IN PART PLAINTIFF'S**
**MOTION FOR DEFAULT FINAL JUDGMENT**

      **THIS CAUSE** comes before the Court upon Plaintiff Avini Health Corporation's Renewed

Motion for Default Final Judgment ("Motion"), [ECF No. 70], filed on April 19, 2024. Having

carefully reviewed the Motion, the record, and being otherwise fully advised, it is hereby

      **ORDERED AND ADJUDGED** that the Motion, [ECF No. 70], is **GRANTED IN PART**

as set forth herein.  In accordance with Fed. R. Civ. P. 58(a), final judgment shall be entered

separately in favor of Plaintiff as to the sole count in the First Amended Complaint ("FAC"), [ECF

No. 18].

**BACKGROUND**[1]

*A.  Factual Background*

      Plaintiff Avini Health Corporation ("Avini") filed a Complaint on October 25, 2022

naming as Defendant Biogenus LLC ("Biogenus").  *See generally* Complaint, [ECF No. 1].  On

January 17, 2023, Avini subsequently filed a First Amended Complaint ("FAC"), [ECF No. 18].

---

[1] The factual background is taken from Plaintiff's FAC, the Motion, the Declaration of Neil Roth ("Roth Declaration"), [ECF No. 70-1], and the April 19, 2024 Declaration of Daniel DeSouza ("DeSouza Decl."), [ECF No. 70-2].  Mr. Roth ("Roth") is the CEO and President of Plaintiff Avini Health Corporation.  Roth Decl. ¶ 2.  Attorney Daniel DeSouza ("DeSouza") is the sole shareholder of the law firm DeSouza Law, P.A. which provided Plaintiff's legal services throughout this action.  DeSouza Decl. ¶ 2.

The FAC sets forth a single cause of action for breach of contract concerning alleged breaches of a Production and Supply Agreement ("Agreement"), [ECF No. 18] at 11–18, between Plaintiff and Defendant. *See generally* FAC. Plaintiff operates on an affiliate marketing model and generally sells branded products for detoxification, immune system support, and over-the-counter pain relievers. FAC ¶ 6. Defendant is in the business of manufacturing, sourcing, contracting, packaging, and providing other miscellaneous services related to the production of products for its customers and clients. FAC ¶ 7. On or about March 1, 2022—Plaintiff as client and Defendant as manufacturer—entered into an Agreement whereby Defendant agreed to produce and/or manufacture certain products as per the terms and conditions specified in the Agreement. FAC ¶ 8. The specific product contemplated by the Agreement was spherical silver nanoparticles in deionized water. FAC ¶ 9. The Agreement further provided that Plaintiff had a right of first refusal for any and all new products developed by Defendant:

> Future Products and Product Development. In addition, Manufacturer shall grant Avini Health Corporation the right of first refusal for any and all new products (the "New Products") for consideration in the Territory through the Authorized Channel of Trade. Avini Health Corporation will be given a maximum period of thirty (30) days to review the New Products before other potential customers are solicited. If New Products are accepted for distribution by the Client, an Amended Production and Supply Agreement will be created.

FAC ¶ 10; Agreement at 12. As alleged in the FAC, the right of first refusal was material to Plaintiff's entry into the Agreement, and it was specifically discussed with Biogenus's principal, Mr. Gary Samuelson ("Samuelson"), prior to the Agreement's execution. FAC ¶ 11. According to the FAC, prior to the parties entering into the Agreement, Samuelson had represented to Plaintiff that he was instrumental in the development of the "REDOX Cell Signaling Supplement" for ASEA, a privately owned international direct selling and multi-level marketing company headquartered in Utah. FAC ¶ 12. The FAC further alleges that Mr. Samuelson further represented

that, prior to the execution of the Agreement, he was the key person in developing ASEA's REDOX product. FAC ¶ 14. Plaintiff estimated that ASEA does approximately $180 million in sales of, and $60 million in profit for, the REDOX product on an annual basis. FAC ¶ 15. Around the time the parties executed the Agreement, Mr. Samuelson represented to Plaintiff that he was working on a new version of the REDOX product that he helped formulate and that this newer version was supposed to work in a 2 oz. concentrated spray, making it superior to ASEA's product, which was sold in a 32 oz. bottle. FAC ¶ 16. According to the FAC, Mr. Samuelson specifically stated to Plaintiff that once his product was fully developed, it would be offered to Plaintiff under the terms of their existing Agreement. *See* FAC ¶ 17.

On July 8, 2022, Mr. Samuelson and his wife Iris attended a dinner for Plaintiff's distributors and affiliates. FAC ¶ 20. At the dinner, Plaintiff alleges that Mr. Samuelson and his wife were seen coming from and going to their car and selling and giving out bottles of Defendant's new REDOX product to Plaintiff's distributors and affiliates. FAC ¶ 21. Prior to this however, Mr. Samuelson had represented to Plaintiff that the product was not yet ready. *See* FAC ¶ 21. Mr. Samuelson and his wife also made multiple representations at the dinner that the product would soon be offered by Plaintiff for distribution. FAC ¶ 21. The next day, on July 9, 2022, Plaintiff held a regional meeting with its distributors and affiliates in West Jordan, Utah. FAC ¶ 18. After the meeting, Plaintiff's representatives met Mr. Samuelson in a hotel room, where Mr. Samuelson stated that he did not yet have the newer REDOX product ready for distribution. FAC ¶ 19. According to the FAC, Mr. Samuelson had repeated this statement several times since the parties executed the Agreement on March 1, 2022 until the July 9, 2022 meeting. *See* FAC ¶ 19. These representations were contrary to the statements made to Plaintiff's distributors and affiliates at the July 8, 2022 dinner. FAC ¶ 21.

After the July 9, 2022 meeting, Samuelson and Iris hosted a dinner at their residence in Utah and told Plaintiff's distributors that Samuelson had the improved REDOX product ready for sale and that the present guests could buy a bottle for $25 each. FAC ¶ 22. Mr. Samuelson also stated this price would be much lower than the price for which Plaintiff would later sell the product. FAC ¶ 22. Both at this dinner and subsequently, Defendant did in fact sell multiple bottles of his new improved REDOX product to multiple Plaintiff's distributors at $25 each. FAC ¶ 23. The FAC also alleges that several distributors confirmed these sales. FAC ¶ 23. As of filing the FAC on January 17, 2023, Plaintiff claims Defendant has continued to refuse to sell its new and improved REDOX product to Plaintiff notwithstanding Defendant's contractual obligations and specific promises to do so. FAC ¶ 24. Moreover, Plaintiff specifically confronted Defendant via its principal, Mr. Samuelson, concerning why Defendant was not supplying Plaintiff with its new REDOX product. FAC ¶ 25. Samuelson responded that he wanted Defendant to be the exclusive seller/supplier of the new product. FAC ¶ 25.

In addition to refusing to sell the new and improved REDOX product to Plaintiff, Plaintiff also alleges that Defendant further breached the parties' Agreement by supplying poor quality nano-silver product. FAC ¶ 26. Specifically, Plaintiff alleges that Defendant had agreed, as part of the parties' dealings, to supply Plaintiff silver product in 5-gallon tubs. FAC ¶ 27. Defendant had provided written specifications before supplying the silver product, specifications indicating the product was supposed to be yellow in color and have 40 ppm of silver per bottle. FAC ¶ 27.

Relatedly, the Agreement references Nutra Pharma Corporation ("Nutra Pharma") in various provisions. FAC ¶ 28. Prior to entering into the Agreement, Plaintiff and Defendant agreed that purchase orders for the nano-silver product would be made by Nutra Pharma on Plaintiff's behalf. *See* FAC ¶ 29. As discussed, and agreed by the parties, Plaintiff and Nutra Pharma maintained a business relationship whereby Nutra Pharma was to receive the silver product

in the 5-gallon tubs, package the product in 4 oz. bottles, store the product pending purchase, and then ship the product to Plaintiff's customers and distributors upon completion of an order.  FAC ¶ 30.  Thus, Nutra Pharma was to function effectively as a drop-shipper for Plaintiff's orders.  FAC ¶ 30.

In early February 2022, before the execution of the Agreement, Plaintiff submitted a purchase order to Defendant for 19 5-gallon tubs of silver product.  FAC ¶ 31.  Notably, Samuelson had indicated that the nano-silver product was supposed to be yellow in color and that a clear product indicated the silver had fallen out of its correct 7 nano sizing.  FAC ¶ 32.  The first order of nano-silver was yellow in color as Samuelson had indicated was proper.  FAC ¶ 32. Accordingly, Plaintiff accepted the nano-silver and the accompanying Certificate of Accreditation sent by Defendant. FAC.  ¶ 33.  On March 30, 2022, Defendant emailed an invoice for the first shipment of silver product to Neil Roth (Plaintiff's President and Chief Executive Officer) and Rik Deitsch (Nutra Pharma's Chief Executive Officer).  FAC ¶ 34.  The invoice read as follows: "Please find the attached invoice. It is great being in business with you." FAC ¶ 34.  Plaintiff subsequently paid the invoice via wire transfer to Defendant.  FAC ¶ 35.

On or about May 5, 2022, after the Agreement had been signed, Plaintiff submitted, through Nutra Pharma, its first *formal* Purchase Order pursuant to the Agreement.  *See* FAC ¶ 36 (emphasis in original).  Defendant confirmed with Plaintiff that the purchase order was to follow the terms of the Agreement and conform with Defendant's specifications for the silver product. FAC ¶ 37.  As with the first order, the product was shipped to Nutra Pharma for packaging and shipping to Plaintiff's customers and distributors but paid for by Plaintiff.  FAC ¶ 38.  And as with the first shipment, Defendant emailed the invoice for the second shipment to both Neil Roth and Rik Deitsch, as reflected in a May 26, 2022 email: "Attached is the invoice and shipping information for 20 Containers of Silver Nanoparticles. It should arrive on Wednesday.  It is being

picked up today at 3pm MST." FAC ¶ 39.  However, the silver product in the second shipment began to turn clear almost immediately after Plaintiff received it, which Plaintiff claims indicated a major instability in the product.  FAC ¶ 40.  Plaintiff tested the product and discovered there was less than 1 ppm of silver per bottle, far below the specified 40 ppm per bottle as indicated in Defendant's Certificate of Accreditation.  FAC ¶ 41.

As a result, Plaintiff was required to pull back 496 packaged bottles in addition to approximately 15 of the mostly unopened tubs.  FAC ¶ 42.  This cost Plaintiff $21,000.00 in out-of-pocket costs and approximately $217,000.00 in lost sales during the 2022 calendar year.  FAC ¶ 43.  Plaintiff could not source replacement silver product for a period of several months and incurred lost sales in the amount of approximately $217,000 (retail of $75.00 per unit multiplied by 2,900 units).  FAC ¶ 43; Roth Decl. ¶ 41. This resulted in around $184,000.00 in lost profits for Plaintiff. Roth Decl. ¶ 41. Plaintiff had buyers for the nano-silver product who had committed to purchase the aforementioned 2,900 units at the $75.00 retail price.  Roth Decl. ¶ 42.  Plaintiff could not fulfill those orders due to Defendant's failure to provide conforming nano-silver product and had to obtain replacement product months after-the-fact, thereby losing the sales it had originally lined up.  Roth Decl. ¶ 42.

As a result of both Defendant's refusal to offer the new improved REDOX product and the poor quality of the supplied silver product, on August 4, 2022, Plaintiff sent a notice of default to Defendant.  FAC ¶ 44.  The parties were unable to resolve the dispute, and according to the FAC, Defendant continues to refuse to supply the new improved REDOX product and has not taken responsibility for the poor quality of the applied silver product. FAC ¶ 45.  Plaintiff, by its Complaint, asserts through its action that Defendant's breach of the Agreement between Avini and Biogenus caused Avini damages for which Avini is entitled to relief.  *See* FAC ¶¶ 47–56.

### B.  Procedural Background

As noted above, Plaintiff initiated this action on October 25, 2022 by filing the Complaint, [ECF No. 1].  Pursuant to Fed. R. Civ. P. 4, Defendant was timely served with a summons and a copy of the Complaint on November 12, 2022.  *See* Proof of Service, [ECF. No. 4].  On January 17, 2023, Plaintiff filed the FAC.  *See* [ECF No. 18].  On January 31, 2023, Defendant filed a Motion to Dismiss the FAC, [ECF No. 26], which the Court denied on March 17, 2023, [ECF No. 36].  On March 31, 2023, Defendant filed an Answer and Affirmative Defenses to the FAC along with a Counterclaim against Plaintiff.  [ECF No. 37].  On October 31, 2023, counsel for Defendant filed a Motion to Withdraw as Counsel ("Motion to Withdraw").  *See* [ECF No. 59]. The Court granted the motion on the same day and set a November 30, 2023 deadline for Defendant to obtain new counsel ("Withdrawal Order").  *See* [ECF No. 61] at 2.  Withdrawing counsel further certified service upon the Defendant of the Court's Order granting the Motion to Withdraw.  *See* [ECF No. 62].

Defendant failed to timely comply with the deadline to obtain new counsel and otherwise ceased to defend itself in this action.  Accordingly, on December 5, 2023, the Court entered an Order Directing Clerk to Enter Default, Requiring Motion for Default Final Judgment, and Dismissing Defendant's Amended Counterclaim against Plaintiff ("Order"), [ECF No. 65].  The Order dismissed Defendant's Amended Counterclaim and struck Defendant's Answer and Affirmative Defenses for failure to comply with the Court's October 31, 2023 Withdrawal Order. *See* generally Order.  The Order also directed the Clerk to enter a Clerk's Default against Defendant and directed Plaintiff to file a Motion for Default Final Judgment within 10 days of the Clerk's Entry of Default.  *See* Order at 2–3.  The Clerk accordingly entered a Clerk's Default against Defendant the same day.  *See* [ECF No. 66].  On December 14, 2023, Plaintiff timely filed a Motion for Default Judgment. [ECF No. 67].

However, on February 6, 2024, the Court denied Plaintiff's First Motion for Default Judgment without prejudice because of its failure to comply with the specific directives in the Order. [ECF No. 68].  Specifically, the Court determined that Plaintiff had failed to adequately comply with the Court's December 5, 2023 Order by (1) failing to provide legal support concerning why it is entitled to reasonable attorneys' fees and costs; (2) failing to provide legal support warranting its requested award of compensatory damages alongside both a preliminary injunction and specific performance; (3) failing to differentiate between the respective purposes of the preliminary injunction and specific performance it requests; and (4) failing to provide the proper accounting required to adjust the equities between the parties where both specific performance and breach of contract damages are to be awarded.  *See id.*  On April 19, 2024, Avini timely filed a Renewed Motion for Default Final Judgment Against Defendant.  [ECF No. 70].  The Court now turns to that Motion.

## LEGAL STANDARD

A party may apply to the court for a default judgment when the defendant fails to timely respond to a pleading. Fed. R. Civ. P. 55(b)(2).  "A defendant, by his default, admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus established." *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009) (cleaned up) (quoting *Nishimatsu Const. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)).  However, conclusions of law are to be determined by the court.  *See Mierzwicki v. CAB Asset Mgmt., LLC*, No. 14-61998, 2014 WL 12488533, at *1 (S.D. Fla. Dec. 30, 2014).  Therefore, a court may enter a default judgment only if there is a "sufficient basis to state a claim." *Id.*

<u>ANALYSIS</u>

"Rule 55 of the Federal Rules of Civil Procedure establishes a two-step procedure for obtaining default judgment." *Federated Life Ins. Co. v. Fifth Third Bank*, No. 2:14-cv-568-FtM-38CM, 2015 WL 859393, at *1 (M.D. Fla. Feb. 27, 2015). First, the clerk of the court must enter a clerk's default against a defendant that fails to plead or otherwise defend a lawsuit. *Id.*; *see* Fed. R. Civ. P. 55(a). Second, after receiving the clerk's default, the court can enter a default judgment provided the defendant is not an infant or incompetent. *Id.*; Fed. R. Civ. P. 55(b)(2); *see also Solaroll Shade & Shutter, Inc. v. Bio–Energy Sys., Inc.*, 803 F.2d 1130, 1134 (11th Cir. 1986) (stating a default judgment may be entered "against a defendant who never appears or answers a complaint, for in such circumstances the case never has been placed at issue"). But "a[n] entry of a clerk's default does not *per se* warrant an entry of default judgment. Rather, a court may enter a default judgment only if 'the well-pleaded allegations in the complaint, which are taken as true due to the default, actually state a substantive cause of action and that there is a substantive, sufficient basis in the pleadings for the particular relief sought.'" *Federated Life*, 2015 WL 859393, at *2 (quoting *Tyco Fire & Sec., LLC v. Alcocer*, 218 F. App'x 860, 863 (11th Cir. 2007)).

### A. The Clerk's Entry of Default

Both requirements of the two-step procedure explained above are clearly met here, as explained below. As to whether there was a valid Clerk's Entry of Default, Defendant's apparent abandonment of its desire to defend further against this lawsuit is confirmed by Defendant's failure to respond to the Court's October 31, 2023 Withdrawal Order after withdrawing counsel properly served it upon Defendant. *See* [ECF No. 62]. Second, Defendant is not a minor or incompetent; thus, the restrictions set forth in Rule 55(b)(2) do not apply. Third, as a Utah limited liability company rather than an individual, Defendant cannot be in the military service of the United States nor any of its allies. Thus, the requirements of the Servicemembers Civil Relief Act, 50 U.S.C. §

3931, are inapplicable here. *See* FAC ¶ 2. Accordingly, the Clerk properly entered a valid Clerk's

Default against Defendant on December 4, 2023. *See* [ECF No. 66].

### B. The Sufficiency of the FAC's Allegations and Requested Relief

But that is not the last step on the circuitous path to final default judgment. As mentioned

above, "a court may enter a default judgment only if the well-pleaded allegations in the complaint,

which are taken as true due to the default, actually state a substantive cause of action and that there

is a substantive, sufficient basis in the pleadings for the particular relief sought." *Federated Life*,

2015 WL 859393, at *2 (cleaned up). As discussed below, the FAC adequately states a cause of

action for breach of contract.

#### 1. Breach of Contract

In the FAC, Plaintiff adequately states a cause of action against Defendant as to its single

count for breach of contract. *See* FAC ¶¶ 47–56. As a threshold matter, the Court notes that the

parties' Agreement specifies that Florida law governs in the event of an action to enforce or

interpret it. Agreement ¶ 22. And to state "a breach of contract claim, Florida law requires the

plaintiff to plead and establish: (1) the existence of a contract; (2) a material breach of that contract;

and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272

(11th Cir. 2009) (citing *Friedman v. N.Y. Life Ins. Co.,* 985 So. 2d 56, 58 (Fla. 4th DCA 2008)).

Here, Plaintiff alleges—and Defendant admits by way of its default—that: (1) a valid

contract exists between the parties; (2) Defendant's breach was material; (3) and Plaintiff suffered

damages as a result of Defendant's breach. FAC ¶¶ 8, 10–11, 17–30, 40–46, 48–56. Specifically,

Defendant is deemed to have admitted the following facts by its default: (1) on or about March 1,

2022, Plaintiff and Defendant entered into a valid and binding Agreement whereby Defendant

agreed to produce and/or manufacture certain products on the terms and conditions specified

therein; (2) "[t]he Agreement is a binding, enforceable contract existing between Plaintiff and

Defendant"; (3) "[t]he Agreement requires Defendant to manufacture/supply certain silver product meeting agreed-upon specifications"; (4) "[t]he Agreement further requires Defendant to offer its new/improved REDOX product to Plaintiff for purchase"; (5) "Defendant breached the Agreement by supplying approximately $21,000.00 of nano-silver product that failed to meet Defendant's own specifications"; (6) "Defendant further breached the Agreement by failing to offer its new/improved REDOX product to Plaintiff for purchase"; (7) "[a]s a direct and proximate result of Defendant's breaches of the Agreement, Plaintiff suffered substantial damages"; (8) "Plaintiff's supply of non-conforming nano-silver product has caused Plaintiff to incur $21,000.00 in direct damages and $217,000.00 in lost sales (amounting to > $184,000.00 in lost profits)"; and (9) "Defendant's breaches of Agreement are ongoing and have already caused and will continue to cause irreparable harm to Plaintiff." FAC ¶¶ 8, 48, 50–55.

In summary, then, Plaintiff alleges breaches of two of the Agreement's provisions—Section 12, which required Defendant to supply nano-silver product in accordance with the specifications agreed by the parties, and Section 7, which provided Plaintiff a right of first refusal for any and all new products developed by Defendant. *See* Mot. at 12. Based on the above facts, all of which Defendant admits as a result of its default, the Court finds that there is sufficient basis in the FAC for compensatory damages.

### 2.  *Remedies*

#### a.  *Specific Performance*

By its Motion, Plaintiff seeks specific performance of Section 7 of the Agreement, which provides for Plaintiff's right of first refusal with respect to the new and improved REDOX product. The equitable remedy of specific performance may be granted at the discretion of the Court when: (1) "the plaintiff is clearly entitled to it," (2) "there is no adequate remedy at law," and (3) "the judge believes justice requires it." *Boardwalk at Daytona Dev., LLC v. Paspalakis*, 220 So. 3d

457, 460–461 (Fla. 5th DCA 2016) (cleaned up) (quoting *Castigliano v. O'Connor*, 911 So. 2d 145, 148 (Fla. 3d DCA 2005)).  "Florida law recognizes the right to enforce specifically a contract only for the sale of real property or for such personal property that is of a unique character and value, such as an antique. *Barnes v. Diamond Aircraft Indus., Inc.*, 499 F. Supp. 2d 1311, 1319 (S.D. Fla. 2007) (citing *Clements v. Leonard,* 70 So. 2d 840, 842 (Fla. 1954); *Mangus v. Porter,* 276 So. 2d 250, 251 (Fla. 3d DCA 1973)).  "Generally speaking, this right is not available for contracts involving personal property where the good is commonly manufactured." *Id.* (citing *DiabloSport, LLC v. Granatelli Motor Sports, Inc.,* No. 605CV312ORL31DAB, 2005 WL 2465019, at *2 (M.D. Fla. Oct. 6, 2005) (finding no specific performance where the plaintiff did not allege that "a commonly available manufactured good" was unique or that its value was difficult to calculate)).

The Court declines to award specific performance because Plaintiff has failed to adequately demonstrate it lacks an adequate remedy at law.  The Court arrives at this conclusion for three separate reasons.  First, Plaintiff has inadequately demonstrated that the REDOX product is in fact unique such that specific performance is warranted. As noted above, specific performance is generally only available where a good is "unique" and not for "contracts involving personal property where the good is commonly manufactured." *Barnes*, 499 F. Supp. 2d at 1319.  Plaintiff's Motion claims that "Plaintiff cannot obtain the new/improved product elsewhere in the market as Defendant exclusively controls the distribution of such." Mot. at 15.  The Court notes, however, that the allegations contained in the FAC rather than the statements in Plaintiff's Motion govern the Court's pleading-sufficiency-and-remedies analysis. And the FAC specifically contradicts Plaintiff's representation that the REDOX product is sufficiently unique to warrant specific performance.

Specifically, the FAC states that "[a]round the time the Agreement was executed, Mr. Samuelson represented that he had been working on a new version of the REDOX product that he helped to formulate. *The product was supposed to be a newer version that can work in a 2 oz concentrated spray (ASEA's product is sole* [sic] *in a 32 oz bottle) that was superior to the ASEA product*." FAC ¶ 16 (emphasis added). The fact that Plaintiff considers Samuelson's product to be superior, even if true, does not, without more, make it unique. Indeed, the FAC all but confirms that Samuelson's product is not unique, as there is a comparable product on the market, namely, ASEA's product, which comes in the 32 oz bottle. *See Barnes*, 499 F. Supp. 2d at 1319 (refusing to grant specific performance where "[Plaintiff] has not denied that other manufacturers are currently producing similar aircraft in the 'very light jet' category."). Thus, by Plaintiff's own allegations, there is evidently an alternative to Samuelson's product on the market. Though Plaintiff might prefer Defendant's version of the product, and though it might indeed be improved given its concentrated formula and smaller bottle, these facts are insufficient for the Court to conclude that the product is sufficiently unique to warrant the extraordinary remedy of specific performance. Accordingly, the Court cannot conclude that Plaintiff lacks an adequate remedy at law to compensate it for Defendant's breach of Section 7.

Second, and relatedly, although Plaintiff's Motion claims that Plaintiff's damages related to Defendant's breach of Section 7 are difficult to quantify, the Motion nonetheless states that "Plaintiff adduced . . . that Defendant sold at least 200 bottles of the REDOX product to Plaintiff's own distributors at a price of $25.00/bottle, resulting in definitive damages of $5,000.00." Mot. at 13. Plaintiff has thus conceded an adequate remedy at law in the form of a reasonable damages estimate resulting from the breach of Section 7. That Plaintiff would prefer the remedy of specific performance does not alter the Court's conclusion that such a remedy is unwarranted on the FAC's alleged facts. Thus, for this reason as well, the Court cannot conclude that there is no adequate

remedy at law for Defendant's breach of Section 7.  Based on the foregoing analysis, the Court declines to grant specific performance for Defendant's breach of Section 7.

### b. Permanent Injunction

Plaintiff also requests from the Court a permanent injunction concerning Defendant's breach of the right-of-refusal provision in Section 7.  Mot. at 15–17.  Specifically, Plaintiff seeks a permanent injunction against Defendant prohibiting it from selling, distributing, and manufacturing any new product, including the REDOX product, without first offering Plaintiff a right of first refusal. Mot. at 16.  A plaintiff seeking an injunction must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a  remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391 (2006).

"Under Florida law, an injunction against the breach of a contract is a negative decree of specific performance of the agreement, and the general rule in such cases is that the court's power to grant such relief is governed by the same rules that govern its power to grant an affirmative decree of specific performance." *DiabloSport, LLC*, 2005 WL 2465019, at *1 (citing Fla.Jur.2d *Specific Performance* § 158 (2005)).  Florida law recognizes the right to specifically enforce certain contracts, such as contracts for the sale of real property.  *See Clements,* 70 So. 2d at 842. "Generally speaking, however, this right is not available for contracts involving personal property, particularly where the court would be required to supervise performance of the contract." *DiabloSport, LLC*, 2005 WL 2465019, at *1 (citing *Mayor's Jewelers, Inc. v. State of Cal. Public Employees' Retirement System, Inc.,* 685 So. 2d 904, 905 (Fla. 4th DCA 1996)). "Because the damages resulting from a breach are generally purely economic, the injured party possesses an

adequate remedy at law, which precludes the granting of injunctive relief in such cases." *Id.* (citing *Mayor's Jewelers, Inc.*, 685 So. 2d at 905).  "However, where there is no adequate remedy at law, and where the personal property is of a unique character and value, Florida courts will grant specific performance of a contract involving personal property. *Id.* (citing *Mangus,* 276 So. 2d at 251 n.1).

The Court declines to issue a permanent injunction for several reasons.  First, as explained above, the Court has already determined that the product at issue is insufficiently unique such that there is no adequate remedy at law.  The same conclusion applies with equal force here.  And while Plaintiff's Motion concedes that specific performance and a permanent injunction in the breach-of-contract context are closely related, Mot. at 15–16, Plaintiff nonetheless claims "[t]he specific performance sought by Plaintiff (that Defendant offer a right of first refusal to Plaintiff with respect to new products) differs slightly from the injunctive relief sought by Plaintiff (that Defendant be prohibited from selling, distributing, manufacturing any new product, including the REDOX product, without first offering Plaintiff a right of first refusal).  Mot. at 16.

Confusingly however, in the earlier section of Plaintiff's Motion requesting specific performance, Plaintiff states "[t]he Court should thus require specific performance of § 7 of the Agreement, both with respect to Defendant's REDOX product and any other 'new' product it has developed or develops in the future." Mot. at 15.  This statement appears to directly contradict Plaintiff's proffered distinction between the two remedies in the section of Plaintiff's Motion requesting a permanent injunction. Though it remains unclear to the Court whether and how the specific-performance and permanent-injunctive remedies Plaintiff requests are indeed distinct given the Motion's inconsistencies, in light of the Court's conclusion that the REDOX product is not sufficiently unique to warrant the extraordinary remedy of specific performance, the Court has no trouble reaching the same conclusion in the permanent-injunction context that it did in the

specific-performance context.  Indeed, as already explained above, there does appear to be an adequate remedy at law: the $5,000.00 in damages Plaintiff estimates resulted from Defendant's breach of Section 7.

Second, Plaintiff's briefing concerning its entitlement to a preliminary injunction is woefully insufficient. For example, Plaintiff dedicates only half a page—just a part of one paragraph—to arguing for a *permanent* injunction, a drastic and extraordinary form of relief that requires burdensome supervision by the courts.  Plaintiff dedicates just one sentence to each of the required elements, *e.g.*, "[t]he threatened injury outweighs any damages to Defendant given that such injunctive relief only forces Defendant to comply with its contractual obligations."  Mot. at 16.  Third, the Court notes that the Agreement was dated March 1, 2022 and was set to continue for a period of two years unless renewed by the parties for an additional two years.  *See* Agreement ¶ 1.  Accordingly, the Agreement expired on March 1, 2024.  Given the parties' dispute, it seems unlikely to the Court that the parties would have renewed their Agreement.  Finally, this Motion represents Plaintiff's second failure to adequately justify its request for specific performance, a permanent injunction, and compensatory damages. The Court already catalogued the First Motion's deficiencies and provided specific guidance to Plaintiff concerning the need to clarify the contours and legal justification for the equitable relief sought in its Renewed Motion.  *See* [ECF No. 68].  Plaintiff has again failed to do so.  Accordingly, Plaintiff's request for a permanent injunction is denied.

### c.  *Compensatory Damages*

#### i.  *Failure to Supply Conforming Nano-silver Product*

Plaintiff seeks compensatory damages in the amount of $205,000.00. This total amount consists of $21,000.00 paid by Plaintiff to Defendant for non-conforming goods (the nano-silver product) and $184,000.00 in lost profits due to Defendant's breach.  FAC ¶ 54; Mot. at 12; Roth

Decl. ¶¶ 40–41.  Defendant admits these damages calculations by virtue of its default.  Therefore, Plaintiff is entitled to an award of $205,000.00 in compensatory damages with respect to Defendant's breach of Section 12 stemming from Defendant's failure to supply conforming nano-silver product.

### ii.  Failure to Offer First Right of Refusal

Plaintiff also includes a damages calculation of $5,000.00 related to Defendant's breach of Section 7 of the Agreement.  Mot. at 13; Roth Decl. ¶ 20; *see also* FAC ¶¶ 22–23.  Plaintiff's estimate is based on Plaintiff's conclusion that Defendant sold at least 200 bottles of the REDOX product to Plaintiff's own distributors at a price of $25.00/bottle, resulting in definitive damages of $5,000.00.  Mot. at 13 (citing Roth Decl. ¶ 20).  The Court accordingly awards $5,000.00 in compensatory damages related to Defendant's breach of Section 7 of the Agreement.

### d.  Costs and Attorneys' Fees

Lastly, Plaintiff seeks an award of attorneys' fees in the amount of $42,355.00 and costs in the amount of $1,985.75 for a total cost and fees award of $44,340.75.  As already noted, in support of its request for fees and costs, Plaintiff has attached to its Motion a declaration from Plaintiff's attorney Daniel DeSouza of the law firm DeSouza Law, P.A.  *See* DeSouza Decl.  The declaration is accompanied by timesheets describing the work performed, the time expended, and the costs incurred.  DeSouza Decl. at 7–14.

Under Florida law, "attorney's fees may only be awarded by a court pursuant to an entitling statute or an agreement of the parties."  *Dade County v. Pena*, 664 So. 2d 959, 960 (Fla. 1995).  The test to determine the prevailing party "is whether the party 'succeeded on any significant issue in litigation which achieves some of the benefit the parties sought in bringing the suit.'"  *Moritz v. Hoyt Enters., Inc.*, 604 So. 2d 807, 809–10 (Fla. 1992) (alterations accepted) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).

Here, Section 23 of the Agreement allows for the prevailing party to recover reasonable attorneys' fees and costs incurred in any suit brought to enforce the Agreement. Moreover, the entry of default judgment against a defendant renders the Plaintiff the prevailing party. *See Simon v. Leaderscape, LLC*, 565 F. Supp. 2d 1332, 1334 (S.D. Fla. 2008). The Court has reviewed the declaration of Avini's counsel filed together with the Motion and finds the attached declaration adequately supports Plaintiff's requested awards of attorneys' fees and costs.

### *i. Costs*

As to costs, the Court awards the Motion's full request for $1,985.75 in taxable costs against Defendant. Mot. at 6. These costs consist of the filing fee, service of the Complaint, service of a subpoena, and deposition transcripts with respect to the depositions of Gary Samuelson (Defendant's principal), Douglas Dickey, and Erik Deitsch (both officers of Plaintiff whose depositions were taken by Defendant). *See* Mot. at 6; DeSouza Decl. at 10–14.

### *ii. Attorneys' Fees*

As discussed above, the Court already concluded Plaintiff is entitled to attorneys' fees based upon Section 23 of the Agreement. The Court now considers the reasonableness of Plaintiff's requested fee amount and awards Plaintiff's full attorneys' fees request of $42,355.00.

The "starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate," known as the lodestar figure. *Hensley*, 461 U.S. at 433. "A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988). To determine the prevailing market rate, courts often consider "the attorney's customary fee, the skill required to perform the legal services, the attorney's experience, reputation and ability, the time constraints involved, preclusion of other employment, contingency, the

undesirability of the case, the attorney's relationship to the client, and awards in similar cases." *Mallory v. Harkness*, 923 F. Supp. 1546, 1555 (S.D. Fla. 1996). The party seeking an award of fees bears the burden of documenting and substantiating the number of hours and hourly rate. *See Hensley*, 461 U.S. at 433.

The Court has performed the lodestar analysis and finds the requested fee amount here to be reasonable. Specifically, the Court finds that Plaintiff's counsel reasonably expended 94.7 hours in connection with pursuing this matter. The Court further finds that $450.00 is a reasonable hourly rate for Plaintiff's counsel, Daniel DeSouza, given the relative complexity of the matter, the results obtained, and the experience of Plaintiff's counsel. *See, e.g., Afford. Aerial Photography, Inc. v. Elegance Transportation, Inc.*, No. 6:21-CV-1166-CEM-LHP, 2022 WL 2306182, at *12 (M.D. Fla. Feb. 23, 2022), *adopted by*, 2022 WL 2306516 (M.D. Fla. Mar. 14, 2022) (finding Plaintiff's counsel's $450.00/hour rate reasonable); *Shelton v. Liberty Mut. Fire Ins. Co.*, No. 8:12-CV-2064-T-30AEP, 2014 WL 631886, at *3 (M.D. Fla. Feb. 18, 2014) (finding $425.00 per hour reasonable for AV-rated lead attorney who "has been practicing for nearly 17 years"); *ADT LLC, v. Security Networks, LLC*, No. 12-81120, 2018 WL 1796269, at *9 (S.D. Fla. Jan. 11, 2018) (finding rates of $425.00–$440.00 per hour reasonable for attorney with over 15 years' experience, admitted to multiple states, and who practices complex commercial litigation); *Bork v. Tran Huong Quynh*, No. 2:19-CV-354FTM38MRM, 2020 WL 6366189, at *2 (M.D. Fla. Oct. 14, 2020) (hourly rate of $450.00 per hour reasonable for 10-year attorney).

Accordingly, the Court awards Plaintiff attorneys' fees in the amount of $42,355.00.

## CONCLUSION

For the foregoing reasons, Plaintiff is entitled to the entry of default final judgment. Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1.      Plaintiff's Motion for Default Final Judgment, [ECF No. 70], is **GRANTED IN PART**.  Default Final Judgment shall be entered by separate order.

2.      Plaintiff shall recover from Defendant $249,340.75, consisting of $205,000.00 in compensatory damages, $1,985.75 in costs, and $42,355.00 in attorneys' fees.

**DONE AND ORDERED** in Miami, Florida this 1st day of July, 2024.

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**